**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SHAWN JAIN, 930 M Street NW, Apt. 237, Washington, DC 20001, on behalf of himself and all others similarly situated, | ) ) ) ) |
|  | CASE No. |
| Plaintiff, | ) ) |
| v. | ) ) JURY TRIAL DEMANDED |
| AMERICAN AIRLINES, INC., DELTA AIRLINES, INC., SOUTHWEST AIRLINES CO., and UNITED AIRLINES, INC., | ) ) ) ) ) |
| Defendants. |  |

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.     This is an antitrust class action arising from a conspiracy by Defendants American Airlines, Inc. ("American"), Delta Airlines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United") (collectively "Defendants") to fix, raise, maintain, or stabilize the price of domestic airline tickets in violation of Section 1 of the Sherman Act.  Defendants effectuated this conspiracy through a number of mechanisms, including by constraining the seating capacity on flights within the United States; limiting the number of flights offered within the United States; and limiting the transparency of pricing information available to domestic airline ticket consumers regarding flights within the United States.  Plaintiff Shawn Jain brings this action on behalf of himself, individually, and on behalf of a proposed class of direct purchasers of domestic airline tickets from one or more of the named Defendants (those direct purchasers defined herein as the "Class") between July 2011 and the present (the "Class Period").

2.      Before a recent round of mergers among the major U.S. airlines within the past ten years, the airline industry was already highly concentrated.  Since that time, it has become even more concentrated, with the four Defendants now controlling over 80% of flights within, to, or from the United States.  During one of the most recent mergers (between American and US Airways), the United States Department of Justice ("DOJ") expressed concern that consolidation within the industry would lead to increased coordination among the remaining airline carriers. Although the DOJ reluctantly approved the American-US Airways merger, its concerns proved to be correct.

3.      Under the guise of the industry buzzword "capacity discipline," Defendants have collusively caused domestic airline ticket prices to rise to and/or remain at supracompetitive levels.  This collusion was facilitated by Defendants' collective dominance in the domestic airline industry and their agreement to refrain from acts that hearken back to the industry's competitive past.  The Defendants have stated publicly that they viewed that competitive past as benefiting consumers at the airlines' expense.

4.      On information and belief, Defendants have coordinated their efforts regarding "capacity discipline" through behind-the-scenes coordination and policing.  The few instances of public recrimination against each other demonstrate that there are open lines of communication between airline executives and that they have no qualms about forcing each other to stay in line and continue to exercise the discipline of an illegal cartel.

5.      Since the last wave of consolidation within the industry, domestic airline ticket prices have outpaced both inflation and competitive rates.  As a direct and proximate result of the conspiracy alleged herein, Defendants have therefore restrained competition in the market for domestic airline tickets and injured Plaintiff and the proposed Class.

6.      In early July 2015, it was widely reported that the United States Department of Justice had sent civil investigative demands ("CIDs") to each of the Defendants.  A spokesperson for the DOJ, Emily Pierce, confirmed this report, stating that the DOJ is investigating "possible unlawful coordination" among the airlines.

7.      Plaintiff and members of the Class have each paid a higher price for domestic airline tickets than they would have paid absent the concerted unlawful activity alleged herein. Plaintiff therefore seeks damages on behalf of himself and the Class for the inflated domestic airline ticket prices Defendants' illegal conduct caused.

## PARTIES

### A.      Plaintiff

8.      Plaintiff Shawn Jain, a resident of Washington, D.C. purchased tickets from Defendants, including a ticket from United for a flight from Washington, D.C. to San Francisco in December 2014, a ticket from Southwest for a flight from Baltimore to Ft. Lauderdale in September 2012, a ticket from American for a flight from Washington, D.C. to Santa Ana in March 2015, and a ticket from Delta for a flight from Washington, D.C. to San Francisco in December 2013.

### B.      Defendants

9.      Defendant American is a Delaware corporation with headquarters in Fort Worth, Texas.  American is a subsidiary of American Airlines Group, Inc., also based in Fort Worth. American Airlines Group, Inc. is also the holding company controlling US Airways, which merged with American in 2013.  Combined, American, US Airways, American Eagle, and US Airways Express run 6,700 flights per day to 339 destinations in 54 countries.  In 2014, American flew 194 million passengers and operated 983 mainline jets.  American Airlines Group

reported a net operating income of $5.073 billion and net income of $4.184 billion in 2014, up

from $1.935 billion net operating income and $1.244 net income in 2013.  Prior to 2013,

American Airlines Group posted losses for three years.

10.     Defendant Delta is a Delaware corporation with its principle place of business in

Atlanta, Georgia.  Delta, and related Delta Connection carriers, fly approximately 15,000 flights

per day to 334 different destinations in 64 countries.   Delta serves 170 million customers per

year and operates over 700 aircraft.  Delta's operating income in 2014 was $2.206 billion and its

net income was $659 million.  In 2013, Delta's operating income was $3.4 billion and its net

income, accounting for an $8 billion income tax benefit, was $2.527 billion.

11.     Defendant Southwest is a Texas corporation with headquarters in Dallas, Texas.

Southwest flies approximately 3,600 flights a day to seven countries.  Southwest serves over 100

million customers annually, and is the largest carrier in terms of "originating domestic

passengers boarded."  In 2014, Southwest had an operating income of $2.2 billion and a net

income of $1.1 billion.  Southwest's common stock (LUV) rose 125% in 2014 and was the top

performer in the S&P 500.

12.     Defendant United is a Delaware corporation with headquarters in Chicago,

Illinois.  United is a wholly owned subsidiary of United Continental Holdings, Inc., a Delaware

corporation also headquartered in Chicago.  In 2013, United merged with Continental Airlines.

United flies approximately 5,000 flights a day, to 373 destinations in 60 countries.  In 2014, it

operated 691 mainline jets and 531 regional jets, serving 138 million passengers.  In 2014,

United had an operating income of $2.373 billion and a net income of $1.132 billion.  A year

earlier, in 2013, United had an operating income of $1.249 billion and a net income of $571

million.

## UNNAMED CO-CONSPIRATORS

13.     On information and belief, at all relevant times, other airlines, entities, and/or persons willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## JURISDICTION AND VENUE

14.     This complaint is filed under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.     Venue is proper in this District pursuant to sections 4(a) and 12 of the Clayton Act, 28 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because at all times relevant to the Complaint, Defendants resided, transacted business, were found within, and/or had agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

16.     This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in this District; (b) directly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

17.     In addition to these bases for jurisdiction and venue, Plaintiff alleges on information and belief that the DOJ's investigation into the conspiracy alleged herein originates out of and is being run by the main office of the Antitrust Division in Washington, D.C.  The DOJ's previous challenge to the American-US Airways merger originated out of the Washington, D.C. office of the Antitrust Division's Transportation, Energy, and Agriculture Section.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action under Rule 23 (a) and (b) of the Federal Rules of Civil Procedure, on behalf of himself and others similarly situated.  The proposed "Class" is defined as:

> All persons and entities who purchased domestic airline tickets directly from one or more Defendant during the Class Period.  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all governmental entities, and any judges or justices assigned to hear any aspect of this action.

19.     While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that the identities of Class members can be readily ascertained from Defendants' books and records.  Given the magnitude of the commerce involved, there are most likely at least hundreds of thousands of class members geographically dispersed throughout the United States, making joinder of all members impracticable.

20.     Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff and all members of the Class directly purchased domestic airline tickets from one or more of the Defendants.  Plaintiff and the other members of the Class were damaged by the same wrongful conduct of the Defendants and the relief sought is common to the Class.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and is represented by competent counsel experienced in antitrust and class action litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of domestic airline tickets sold in the United States;

b.     Whether Defendants' conduct violated federal antitrust laws;

c.     Whether Defendants' conduct caused the price of domestic airline tickets sold in the United States to be artificially high and at supracompetitive levels; and

d.     Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

23.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy, since joinder of all Class members is impracticable and the cost of litigation would likely far outweigh the likely value of individual Class member claims.  At the same time, the prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

24.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

        a.     Defendants and their co-conspirators have sold domestic airline tickets throughout the United States;

        b.     Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell domestic airline tickets throughout the United States;

        c.     The conspiracy alleged herein has affected billions of dollars of commerce.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce.

## FACTUAL ALLEGATIONS

### A.     Background on the Airline Industry and its Current Unprecedented Profits

25.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which deregulated the domestic airline industry.  The ADA removed government control over fares, routes, and market entry of new airlines, allowing market forces to dictate these and other facets of the industry.

26.     Since 1978, Defendants have competed over fares, routes, and seats.  In recent years, however, the airline industry has seen significant express coordination, which has led to higher fares, new and increased fees, and less options for American consumers.

27.     Today, the domestic airline passenger industry is highly concentrated.  As a result of a series of mergers, including in particular since 2008, Defendants American, Delta, United and Southwest, the four largest airlines in the United States, now control approximately 80% of

the domestic airline market.[1]  News sources report that the airlines also collected $3.6 billion in

bag fees and $3 billion in reservation-change fees in the past two years.

28.     The airline industry has earned record profits, including a combined $19.7 billion

in profits in the past two years.  The International Air Transport Association ("IATA"), an

international trade body representing over 240 domestic and international airlines, predicts that

North American airlines will obtain approximately $13.2 billion in net after-tax profits in 2015, a

number that exceeds the industry's previous peak profits from the 1990s.

29.     According to data from the federal Department of Transportation's Bureau of

Transportation Statistics, the average domestic airfare rose at an inflation-adjusted 13 percent

from 2009 to 2014.  As discussed further below, much of this rise in prices results directly from

Defendants' mutual commitment to keep airline capacity artificially low.  Defendants also

engaged in a concerted campaign to reduce consumers' ability to compare air fares by limiting

online travel agencies' ("OTAs") access to fare data and by forcing consumers to use

Defendants' websites rather than other retail channels for domestic airline tickets.

30.     Emblematic of Defendants' conspiracy is the lack of price movement in response

to recent, significant decreases in the cost of jet fuel.  One estimate found that for April 2015,

United States airlines paid $1.94 per gallon for jet fuel, a decrease of 34% from the previous

year.  Nevertheless, airfares have continued to rise, regardless of the decrease in airline operating

costs.

31.     In December 2014, United States Senator Charles E. Schumer (D-NY) called for a

federal investigation of United States airlines.  As Senator Schumer stated: "At a time when the

---

[1]   These mergers began in 2005 with the merger between US Airways and America West.  In
2008, Delta and Northwest Airlines merged.  In 2010, United and Continental merged.  In 2011,
Southwest and AirTran merged.  In 2013, American and US Airways merged, creating the
largest airline in the world.

cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. . . .  The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather."  Senator Schumer also noted that airlines were set to make a profit of $7.08 per passenger in 2015, up from $6.02 in 2014 and $3.38 in 2013.

32.     Defendants' collusion has been facilitated by the mergers and acquisitions that have enabled the four Defendants to dominate the U.S. airline market.

33.     The DOJ was concerned with exactly this scenario when it initially challenged the merger between American and US Airways in 2013.  *See United States v. US Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.).  Specifically, the DOJ noted at the time that "[t]he structure of the industry is already conducive to coordinated behavior."  *Id.*  As one example, the DOJ noted that airlines closely watch each other's fares and consistently match each other's fare increases.  As another example, the DOJ pointed to the use of "cross-market incentives" ("CMIs") to deter fare wars.  "A CMI occurs where two or more airlines compete against each other on multiple routes.  If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market – a CMI – where the [original] discounting airline prefers a higher fare.  CMIs often cause an airline to withdraw fare discounts."  *Id.*  In other words, the airline industry is structured such that, to the extent there is an understanding or agreement to act in coordinated ways, airline competitors would be (and are) able to punish each other quickly for stepping out of line.  This creates a strong enforcement mechanism for any collusive activity.

34.     The DOJ also noted past express coordinated behavior by the airlines in the creation of Airline Tariff Publishing Company ("ATPCO"), a "dedicated price-telegraph

network for the industry."  As DOJ explained, "[t]he airlines use ATPCO to monitor and analyze

each other's fares and fare changes and implement strategies designed to coordinate pricing.

Airlines have previously used ATPCO to engage in coordinated behavior.  In 1992, the United

States filed a lawsuit to stop several airlines, including [American and US Airways], from using

their ATPCO filings as a signaling device to facilitate agreements on fares.  That lawsuit resulted

in a consent decree, now expired."  Given past practice and the continued ability to this day to

signal each other regarding agreements on fares, this factor of the industry similarly makes

coordinated activity not only possible, but likely.

35.     The DOJ's 2013 complaint also recounted a disturbing example of direct

communication between airline executives regarding pricing behavior:

> US Airways also has communicated directly with a competitor when it was upset
> by that competitor's efforts to compete more aggressively.  In 2010, one of US
> Airways' larger rivals extended a "triple miles" promotion that set off a market
> share battle among legacy carriers.  The rival airline was also expanding into new
> markets and was rumored to be returning planes to its fleet that had been
> mothballed during the recession.  US Airways' CEO complained about these
> aggressive maneuvers, stating to his senior executives that such actions were
> "hurting [the rival airline's] profitability – and unfortunately everyone else's."
> US Airways' senior management debated over email about how best to get the
> rival airline's attention and bring it back in line with the rest of the industry.  In
> that email thread, US Airways' CEO urged the other executives to "portray[ ]
> these guys as idiots to Wall Street and anyone else who'll listen."  Ultimately, to
> make sure the message was received, US Airways' CEO forwarded the email
> chain—and its candid discussion about how aggressive competition would be bad
> for the industry—directly to the CEO of the rival airline.  (The rival's CEO
> immediately responded that it was an inappropriate communication that he was
> referring to his general counsel.)

36.     The DOJ ultimately settled its case against American and US Airways by

allowing the merger to occur on the condition that the merging airlines divest certain flight slots

in order to permit competition with smaller competitors.  Nevertheless, the combined America-

US Airways entity now controls over 20% of domestic passenger revenue within the United

States.

37.     The airline industry is also marked by significant barriers to entry, given (among other things) the need for government clearance to operate an airline along approved flight paths, the high cost of building out an airline fleet, the finite number of gates at airports throughout the nation, and the difficulty in obtaining constant access to such gates.

38.     Collusion here is also facilitated by Defendants' membership in trade associations, including, among others, Airlines for America and the IATA.  Defendants also have a history of direct communication with each other regarding competitive issues, and have a network of financial analysts and other channels through which they can send messages to each other.

39.     Defendants' pricing behavior, as discussed herein, has been inconsistent with a competitive market.

**B.      Defendants Agree to Exercise "Capacity Discipline," and Police the Conspiracy by Reaffirming in Public and Private That They Are Adhering to the Agreement**

40.     Defendants' primary mechanism in their efforts to collusively raise prices for airline consumers is their shared commitment to enforcing "capacity discipline."  As used by Defendants, "capacity discipline" is a euphemism for limiting the number of flights and seats available to consumers.  Defendants' coordination on offering only ever-higher fares for the artificially limited number of flights enabled Defendants to raise prices for domestic airline tickets to supracompetitive levels.

41.     Defendants' recently-discovered "capacity discipline" can be traced back to the industry's most recent wave of consolidation.  As the DOJ noted in its August 2013 complaint against the American-US Airways merger, each significant legacy airline merger in recent years (the "legacy" airlines are American, Delta, and United) has been followed by substantial reductions in capacity.  According to the DOJ, "[t]hese capacity reductions have not consisted

simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."

42.     The key to "capacity discipline," however, is that it will not be able to create outsized profits for an airline if that airline is the only competitor exercising such "discipline." Put differently, if a single airline reduces capacity on its flights and raises prices as a result, then travelers will turn to other airlines with more capacity and, thus, lower prices.  But if other airlines act similarly – meaning travelers are faced with reduced capacity and higher prices at all turns – then travelers have no choice but to pay higher prices.  The alternative is to not fly at all, which is an unacceptable option for many of Defendants' customers.

43.     For this reason, capacity discipline will only benefit an airline if it has reasonable assurance that it is either the exclusive (or near exclusive) carrier for a particularly city-pair route, or, for city-pair routes with multiple carrier options, that its competitors will engage in the same "discipline."  It would be against an airline's independent self-interest for it to exercise "capacity discipline" unless its competitors also do so.  In Defendants' case, their shared commitment to capacity discipline was made feasible and rational by their knowledge that each had agreed to engage in the same capacity limitations.

44.     Defendants also signaled to each other that they remained committed to this agreement by publicly discussing their plans to continue exercising "capacity discipline."  For example, Jeff Sismek, the CEO of United, discussed United's $2 billion profits in 2014 and stated, "[w]e will absolutely not lose our capacity discipline . . . . It's very healthy for us and very healthy for the industry."

45.     Similarly, in announcing Delta's 2014 fourth quarter results, Delta's chief executive, Richard Anderson, stated, "As we begin 2015, we have a significant opportunity from

lower fuel prices, which will drive more than $2 billion in fuel savings over 2014.  Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."

46.     More recently, Delta's Anderson (echoing the comments of United's Smisek cited above) stated: "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."

47.     Prior to the American-US Airways merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to toe the line with its competitors by exercising "capacity discipline."

48.     American's president, Scott Kirby, confirmed at an investment conference on March 3, 2015 that the company would not be adding capacity via additional airplanes: "Almost all of our capacity growth domestically is about putting more seats on airplanes."  This type of capacity increase is *de minimis* and still permits the airline to charge higher rates because of the lack of additional flights.

49.     Indeed, as American's Kirby confirmed, each of the four Defendants were only interested in increasing capacity by way of cramming a relatively small number of additional seats onto airplanes: "All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their existing aircraft. *Once you've done that, you're done*."

50.     In the few instances where it appeared that a Defendant might break from the capacity limitation conspiracy, the response was swift and effective.  On May 20, 2015, Gary C.

Kelly, the CEO of Southwest, announced a break from the industry stance on discipline, stating

that Southwest planned to increase its capacity by as much as eight percent by acquiring two new

gates at its hub at Love Field, Dallas.  The industry reaction was instantaneous.  The stock prices

of the other Defendants plummeted.  Raymond James analyst Savanthi Syth wrote in response to

the shift, in a research note: "understandably, investors are questioning if this signals the end of

the era of industry capacity discipline."  Additionally, Wolfe Research airline analyst Hunter

Keay stated: "Domestic capacity discipline has effectively vanished."

51.     As a result of this announcement, the other Defendants took action to ensure that

Southwest did not destroy capacity discipline.

52.     The IATA's annual meeting took place on June 7-9, 2015 in Miami, Florida.

Chief executives of many of the leading passenger airlines were in attendance.  During the

course of that meeting, several of them spoke publicly about the need for "discipline" within the

industry.  Delta's President, Ed Bastian, said that Delta is "continuing with the discipline that the

marketplace is expecting."  American's chief executive, Douglas Parker, stated that the airlines

had learned their lessons from past price wars, noting that "I think everybody in the industry

understands that."

53.     On June 11, 2015, the *New York Times* published an article titled "'Discipline' for

Airlines, Pain for Fliers," in which the author, James B. Stewart, commented: "Discipline is

classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins.

This year, that discipline seems to be working: the IATA projected this week that airline industry

profits would more than double this year to nearly $30 billion, a record."  The New York Times

also noted:

> When airline industry leaders say they're going to be disciplined, "they
> mean they don't want anyone to expand capacity," said Fiona Scott

Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."

54.     The statements of the various airline executives and the pressure placed on Southwest at the IATA meeting had the desired effect. The New York Times article also noted, "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. 'We have taken states this week to begin pulling down our second half 2014 to manage our 2015 capacity growth . . .' Kelly said."

C.      **Defendants Coordinated to Reduce Airfare Price Transparency**

55.     Defendants have also reduced price transparency within the industry by targeting OTAs and metasearch websites.[2] The purpose of these efforts is both to eliminate comparison shopping (and the competition it brings) and increase prices by driving online ticketing traffic to Defendants' own websites or reducing the benefits of using OTAs and metasearch sites.

56.     On May 19, 2015, the Travel Technology Association issued a report prepared by Charles River Associates and authored by Dr. Fiona Scott Morton entitled "Benefits of Preserving Consumers' Ability to Compare Airline Fares" (the "TTA Report"). The TTA Report noted that competition within the U.S. airline industry had suffered because of domestic passenger airline mergers and the major airlines' collective efforts to lead travelers away from OTAs.

57.     By providing comparisons among different airlines' prices for the same routes, OTAs facilitate price transparency. On information and belief, each of the Defendants have demanded that OTAs, both large and small, agree to onerous terms that would prevent the OTAs

---

[2] A metasearch travel site is one in which an online user may compare prices from several different travel sources, such as the airlines and OTAs. Some of the most well-known metasearch sites include Kayak, TripAdvisor, Google Flights, Hipmunk, Skyscanner, and Fly.com.

from providing accurate price comparisons for consumers, force the OTA to refrain from offering any further price comparisons at all, or add on fees to consumers for using OTA services that would erase any benefit to having the price transparency that OTAs provide. The airlines' coordinated efforts to restrict OTAs' ability to provide such comparisons and price reductions was and remains a blatant attempt to drive up prices.

58. Along these lines, the TTA Report found, among other things, that:

• Restrictions by airlines of broad access to airline information—*i.e.*, prices and schedules—substantially reduces consumer welfare. The TTA Report estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only airline websites could exceed $6 billion per year. In addition, such restrictions may result in up to 41 million passengers annually choosing not to fly.

• Beyond independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do. Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare. Restricting airline schedule information has the opposite effect.

• Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US Airways, for example, has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets.[3] In certain city-pair markets in which the American-US Airways merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The

---

[3] "City-pair" refers to the two cities on either side of an airline route. Thus, a flight between Washington, D.C. and New York is considered the "D.C.-New York city-pair."

welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city-pairs.

- Airline profits globally are at an all-time high, expected to reach $25 billion for 2015. While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.

59.     The TTA Report also notes that Defendants have engaged in coordinated efforts to stifle online metasearch airfare websites.  These efforts include:  prohibiting metasearch sites from referring consumers to an OTA for booking a flight; prohibiting OTAs from providing airline information to metasearch sites; prohibiting global distribution systems ("GDSs") from providing airline price and schedule information to "unauthorized" metasearch sites[4]; prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata; refusing to pay metasearch sites for direct referrals to the airline's own booking website; and prohibiting metasearch sites from displaying price information of the airline.

60.     Each of the four Defendants has engaged in the activities discussed above.  On information and belief, the value to Defendants of quashing competition that OTAs and metasearch sites provide could be as much as $30 per passenger.

**D.      United States Senator Richard Blumenthal (D-CT) Raises Awareness Regarding the Airlines' Collusive Activities**

61.     On June 17, 2015, shortly after the *New York Times* published its article, the United States Senator for Connecticut, Richard Blumenthal, wrote a letter to United States

---

[4]   GDSs are the intermediaries between OTAs and airlines that aggregate flight information across airlines. GDSs link directly to airlines' reservation systems and enable travel agents with a single connection to a GDS to book flights with all of the airlines. GDSs also offer OTAs competitive rates of compensation for their distribution services, which enables OTAs to offer lower prices to travelers.

Assistant Attorney General, William Baer.  With respect to the withdrawal by Southwest of its plan to increase capacity, Senator Blumenthal stated, "[t]he conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company."

62.     Senator Blumenthal urged the DOJ to investigate collusion in the airline industry. stating, "[a]s you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling."

63.     Senator Blumenthal's letter went further, recalling the DOJ's previous concerns raised during its investigation into the US Airways/American merger:

> The Complaint specifically documented the troubling history of US Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at US Airways complained that competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of industry…[The CEO] urged the other executives to, 'portray these guys as idiots to Wall Street and anyone who'll listen.'"

> The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior…the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

64.     Finally, Senator Blumenthal concluded with a plea to act:

> I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by  recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these

comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anticonsumer behavior.

**F.     The Department of Justice Initiates an Investigation Into Defendants' Collusion**

65.     The DOJ acted promptly, and on July 1, 2015, a variety of news outlets reported that the DOJ had sent civil investigative demands ("CIDs") to a number of airlines the day before.  A spokesperson for the DOJ, Emily Pierce, confirmed this report, stating that the DOJ was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping ticket prices high.  All four Defendants have publicly confirmed that they received CIDs from the DOJ.

66.     According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation. In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed." Ch. III § B(1).  Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy. *The greater the potential significance of the matter, the more likely the request to open an investigation will be approved.*" *Id.* (emphasis added).

67.     On July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office was also conducting a similar investigation into collusive activity among air carriers, and had sent letters to American, Delta, Southwest and United.

68.     Senators Blumenthal and Schumer publicly applauded the DOJs investigation of Defendants.  Senator Blumenthal stated, "[t]his investigation must be tireless and timely to save

consumers from the onslaught of price increases in summer fares that may result from collusive and anticompetitive airline company misconduct."  Senator Schumer agreed, "[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed . . . . We know when airlines merge, there's less price competition."

G.      **Economic Evidence Demonstrates the Conspiracy in Action**

69.     The average domestic flight in 2014 cost $392, the highest annual fare since the Bureau of Transportation began collecting air fare records in 1995 and 2.5 percent higher than the previous high of $382 in 2013.  *See* http://www.rita.dot.gov/bts/press_releases/bts021_15. When adjusted for inflation, fares are at a 12-year high.

70.     Defendants' coordinated lack of price competition also manifests itself in the way that domestic airline ticket prices not been reduced in response to recent dramatic decreases in fuel costs.  Because fuel is the largest operating cost for airlines, lower fuel costs should result in lower fares in a competitive market.  However, Defendants' ticket prices have not been reduced, but instead have increased, as the price of fuel has dropped during the past four years**.**

71.     As long as capacity is limited, there is no incentive for airlines to reduce fares, no matter how low fuel prices go.  And this is exactly what has happened in practice.  Although jet fuel prices have significantly declined over the last four years, the price of domestic airfare has actually *increased*, which further demonstrates the pervasiveness of Defendants' conspiracy.

**ACCRUAL OF CLAIM, CONTINUING VIOLATION,**
**EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT**

72.     Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this complaint.  Before Defendants' recent coordinated statements regarding "capacity discipline," it was not reasonably apparent that they were each engaged in the same practices.

73.     Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and Class members.  These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

74.     In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying supracompetitive prices for domestic airline tickets throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

75.     Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

76.     Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices, or engaging in the other unlawful collusive practices alleged herein. By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

77.     On information and belief, Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed:

        a.      by meeting secretly (including use of private telephonic communications) to discuss prices, customers, capacity, and markets for domestic airline tickets sold in the United States and elsewhere;

        b.      by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

        c.      by holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

        d.      by disguising price-fixing meetings and communications as technical and operational meetings.

## ANTITRUST INJURY

78.     The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

        a.      Prices charged by Defendants and their co-conspirators to Plaintiff and the members of Class for domestic airline tickets were maintained at artificially high and supracompetitive levels;

        b.      Plaintiff and members of the Class were required to pay more for domestic airline tickets than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

        c.      Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for domestic airline tickets.

79.     During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiff and members of the Class directly purchased domestic airline tickets in the United States.

80.     Plaintiff and the other Class members paid more for the domestic airline tickets than they would have paid under conditions of free and open competition.

81.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

82.     This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLAIM FOR RELIEF

### (For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

83.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

84.     Beginning at a time presently unknown to Plaintiff, but at least as early as July 2011 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

85.     In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

a.      agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices for domestic airline tickets sold in the United States;

b.      participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for domestic airline tickets;

c.      meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

d.      refraining from competing by refusing to offer domestic airline tickets at prices below the agreed-upon fixed price.

86.      The combination and conspiracy alleged herein has had the following effects, among others:

e.      Price competition in the sale of domestic airline tickets has been restrained, suppressed, and/or eliminated;

f.      Prices for domestic airline tickets sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

g.      Those who purchased domestic airline tickets directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

87.      Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of domestic airline tickets.

88.      As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and the members of the Class have been injured and damaged in their respective businesses and property in an amount to be determined

according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

89.     The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PETITION FOR RELIEF

WHEREFORE, Plaintiff petitions that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 (a) and (b) of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative and that Plaintiff's counsel be appointed as counsel for the Class.

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

C.     Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein.

D.      The Court award Plaintiff and members of the Class such other, further and different relief as may be necessary and appropriate.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury trial of all claims asserted in this Complaint so triable.


Dated: July 8, 2015

**WHITFIELD BRYSON & MASON LLP**

*/s/ Gary E. Mason*_____
Gary E. Mason (DC Bar No. 418073 )
Jason S. Rathod (DC Bar No. 100082)
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290


*Attorneys for Plaintiff Shawn Jain and the Class*